## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **GLENN SHENTON, *et ux.*** | : | **Case No. 1:19-CV-01426** |
| | : | |
| **Plaintiff,** | : | |
| | : | **Judge Reggie Walton** |
| **v.** | : | |
| | : | |
| **POTOMAC   ELECTRIC   POWER COMPANY, *et al.*,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

---

### PLAINTIFFS' MOTION FOR AN AWARD OF SANCTIONS PURSUANT TO: (i) FED. R. CIV. P. 37 AND THE COURT'S ORDER OF APRIL 27, 2022; (ii) 28 U.S.C. 1927; (iii) THE COURT'S INHERENT POWER, AS WELL AS DUE TO THE SPOLIATION OF EVIDENCE

This negligence case arises from Plaintiff Glenn Shenton's trip and fall over a metal utility grate owned and controlled by Defendant Potomac Electric Power Company ("PEPCO"). (Amended Complaint, ¶¶24-29.)  Since discovery began in May 2021, Plaintiff has continually been obstructed in an egregious and systematic manner by Defendant and its counsel such that the imposition of significant sanctions are warranted, including attorney fees and costs.  And due to the clear spoliation of evidence by PEPCO, the additional sanction of a default judgment in favor of the Plaintiffs or, at a minimum, an adverse evidentiary inference, together with an award of attorneys' fees and costs, is similarly merited.

Respectfully submitted,

*/s/ Christopher P. Finney*_____
Christopher P. Finney (OH0043)
Curt C. Hartman, *of counsel* (OH0040)
Julie M. Gugino, *pro se* (0074471)
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Blvd., Suite 225
Cincinnati, OH 45245
Chris@FinneyLawFirm.com
Julie@FinneyLawFirm.com
*Trial attorneys for Plaintiffs*
*Glenn Shenton and Pamela Shenton*

i

## TABLE OF CONTENTS

I.   LEGAL STANDARD AND THE IMPOSITION OF SANCTIONS ............................. 1

   A.   Fed R. Civ. P. 37 and Spoliation. ............................................................................. 1

   B.   28 USC §1927 Counsel's liability for excessive costs. .................................................. 3

   C.   Inherent Power of the Court. .......................................................................................... 4

   D.   Standard for dismissal pursuant to Fed. R. Civ. P. 37. ................................................. 4

II.   FACTUAL BACKGROUND ................................................................................................ 5

   A.   History Of Discovery Procedures in this Matter. .......................................................... 5

   B.   Identifying Who Repaired the Grate: Anthony Green and Michael Gladden. ............ 7

   C.   PEPCO has spoliated the evidenced by destroying or making "unavailable" discoverable documents and Plaintiffs request this Court make an adverse inference.... 14

      a.   The depositions in this matter revealed numerous documents that should exist, that have been requested, which PEPCO has failed to produce. ........................................................... 18

   D.   Defendant's Misleading Discovery Production. ............................................................. 22

   E.   Public Documents Designated "Confidential" in Violation of Protective Order. ....... 24

   F.   Abuse in Claiming Attorney Client Privilege. ............................................................... 25

   G.   Repeated Problems Scheduling Depositions. ................................................................. 26

III.   LAW AND ARGUMENT ................................................................................................... 28

   A.   PEPCO is liable to Plaintiffs if Plaintiffs prove that PEPCO had prior notice of the hazardous condition of the Grate and/or the hazardous condition of the Grate was created by PEPCO and Plaintiffs request this Court make an adverse inference under FRCP 37(e)(2)(A) that the lost information was unfavorable to PEPCO..................................... 28

**B.  This Court Should Issue Sanctions under its Inherent Authority and 28 USC §1927.** 32

**C.  This Court Should Sanction Defendant with a Default Judgment in Favor of Plaintiffs on the Issue of Liability**............................................................................... 34

    *i.  Plaintiffs have been severely prejudiced by the Defendants' misconduct.* ................... 34

    *ii.  This Court has been prejudiced and burdened by the Defendant's abuse of the discovery process.* ........................................................................................ 39

    *iii.  The Defendant's conduct is so egregious that the Court must sanction them with a default judgment to deter similar misconduct in the future.* .................................. 39

**D.  This court should sanction Defendant with the payment of Plaintiffs' attorneys fees for bringing this Motion and Plaintiffs' Motion to Compel.**............................... 41

**IV.  CONCLUSION** ....................................................................... 42

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Chambers v. NASCO, Inc.,* 501 U.S. 32, 35, 111 S. Ct. 2123, 2128 (1991)................................. 33

*Chen v. Dist. of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011) ................................... 2

*District of Columbia v. Freeman*, 477 A.2d 713, 718 (D.C. 1984) ................................ 28

*Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 170 (D.C. Cir. 2013)............................. 2

*Healey v. Labgold*, 231 F. Supp. 2d 64, 68 (D.D.C. 2002)........................................... 33

*Huthnance v. District of Columbia*, 793 F. Supp. 2d 177, 181 (D.D.C. 2011) ............................. 4

*In re Erin & Kyle Ltd. Pshp.,* Case No. 96-01318, (Chapter 11), 1997 Bankr. LEXIS 188, at *1

   (Bankr. D.D.C. Feb. 27, 1997) ................................................................. 32

*In re Rosebar,* 505 B.R. 82, 84 (Bankr. D.D.C. 2014) ................................................. 4

*Johnson v. Washington Gas Light Co.*, 109 A.3d 1118 (D.C. 2015)................................. 1, 28, 29

*Mannina v. District of Columbia*, 437 F. Supp. 3d 1, 6 (D.D.C. 2020)...................................... 2, 3

*NAACP v. Fla. Dep't of Corr.*, 2002 U.S. Dist. LEXIS 27837, at *6 ( M.D. Fla. July 16, 2002).. 3

*Priority One Servs. v. W&T Travel Servs., LLC,* 987 F. Supp. 2d 1, 2 (D.D.C. 2013) ............ 4, 41

*Shepherd v. ABC*, 62 F.3d 1469, 1472 (D.C. Cir. 1995)............................................... 5, 32, 34, 41

*Sherman v. District of Columbia*, 653 A.2d 866, 870 (D.C. 1995) ............................................. 28

*Slate v. ABC, Inc.*, 941 F.Supp.2d 27, 49-50 (D.D.C. 2013) ....................................... 35

*Societe Internationale Pour Participations Industrielles et Commerciales S.A. v. Brownell*, 225

   F.2d 532, 541 (D.C. Cir. 1955) ................................................................. 1

*Sullivan v. AboveNet Communs., Inc.*, 112 A.3d 347 (D.C. 2015).......................................... 1, 28

*United States v. Di Mucci*, 879 F.2d 1488 (7th Cir. 1989) .......................................... 34

*United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 127-128 (D.D.C. 2012).............. 38

*United States v. Wallace*, 964 F.2d 1214, 1217 (D.C. Cir. 1992)............................................. 3, 32

*Va. Hosp. Ctr. - Arlington Health Sys. v. Akl (In re Akl),* No. 07-00256 (Chapter 7), 2011 Bankr.

    LEXIS 2287, at *1 (Bankr. D.D.C. June 14, 2011) .................................................................. 3

*Wanderer v. Johnston*, 910 F.2d 652 (9th Cir. 1990). .................................................................. 39

*Webb v. District of Columbia,* 146 F.3d 964, 971 (D.C. Cir. 1998)................................... 5, 34, 39

## **STATUTES**

28 USC §1927.................................................................................................................. 3, 32, 41

## **RULES**

Fed. R. Civ. P. 37 ................................................................................................. 1, 2, 4, 5, 32, 41

## <u>MEMORANDUM</u>

Throughout discovery efforts in this case, PEPCO and its counsel has avoided, obfuscated, and outright misled concerning the following critical issues in this case: (i) whether PEPCO had actual or constructive notice of the utility grate's hazardous condition; (ii) all work or repairs on the utility grate by PEPCO; and (iii) the extent to which the hazardous condition of the utility was created by PEPCO. All of these areas of inquiry go directly to establishing negligence liability on the part of PEPCO, *see Sullivan v. AboveNet Communs., Inc.*, 112 A.3d 347 (D.C. 2015); *Johnson v. Washington Gas Light Co.*, 109 A.3d 1118 (D.C. 2015), and, thus, there clearly exists the self-serving incentive and consciousness on the part of PEPCO and its counsel to deliberately engage in avoidance and gamesmanship of their discovery obligations and advancement of the truth-seeking purpose of discovery. *See Societe Internationale Pour Participations Industrielles et Commerciales S.A. v. Brownell*, 225 F.2d 532, 541 (D.C. Cir. 1955)("[i]t is settled that 'the fullest possible knowledge of the issues and facts before trial' is intended by the rules governing discovery" (quoting *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)).

## I.   LEGAL STANDARD AND THE IMPOSITION OF SANCTIONS

### A. Fed R. Civ. P. 37 and Spoliation.

Rule 37 of the Federal Rules of Civil Procedure provide,

(e) Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) **presume that the lost information was unfavorable to the party;**

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

A district court may impose issue-related sanctions whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue. *Shepherd v. ABC*, 314 U.S.App.D.C. 137, 62 F.3d 1469, 1478 (1995). Further, sanctions may include awarding a default judgment in favor of the adversely affected party. Fed. R. Civ. P. 37(d)(3) and 37(2)(C.)

"This Court has inherent power to sanction abuses of the judicial process, including discovery abuses." *Mannina v. District of Columbia*, 437 F. Supp. 3d 1, 6 (D.D.C. 2020). "A party that fails to preserve evidence 'runs the risk of being justly accused of spoliation' – defined as 'the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation' – and find itself the subject of sanctions." *Chen v. Dist. of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011). And, thus, the D.C. Circuit "has recognized that a negative inference may be justified where the defendant has destroyed potentially relevant evidence." *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 170 (D.C. Cir. 2013).

A court must find three elements before awarding spoliation sanctions:

(1) The party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) [t]he destruction or loss was accompanied by a 'culpable state of mind;' [and] (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defense of the party that sought it.

*Chen*, 839 F. Supp. 2d at 13. "The standard of proof for the award of issue-related sanctions, such as the preclusion of evidence or adverse inference instructions, is a preponderance of the evidence.

The standard of proof for the award of penal sanctions, such as fines, fees, and dismissal, is clear and convincing evidence." *Mannina*, 437 F. Supp. 3d at 6 (internal citation omitted).

## B. 28 USC §1927 Counsel's liability for excessive costs.

Further, 28 USC §1927 provides that,

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

The purpose of § 1927 is to allow a court "to assess attorneys' fees against an attorney who frustrates the progress of judicial proceedings." *United States v. Wallace*, 964 F.2d 1214, 1217 (D.C. Cir. 1992). And "Section 1927 sanctions may be appropriate where counsel has committed discovery abuses…." *NAACP v. Fla. Dep't of Corr.*, 2002 U.S. Dist. LEXIS 27837, at *6 ( M.D. Fla. July 16, 2002). In addition, Courts possess inherent authority to issue sanctions and use Section 1927 to sanction attorneys who abuse the judicial process with "repeated or singularly egregious" misbehavior. *United States v. Wallace,* 964 F.2d 1214, 1220, 296 U.S. App. D.C. 93 (D.C. Cir. 1992). Conduct that recklessly multiplies the proceedings in an unreasonable fashion is adequate to warrant a finding of vexatiousness under 28 U.S.C.S. § 1927. While the language of §1927 suggests deliberate misbehavior, subjective bad faith is not necessary; attorneys have been held accountable for decisions that reflect a reckless indifference to the merits of a claim. *Va. Hosp. Ctr. - Arlington Health Sys. v. Akl (In re Akl),* No. 07-00256 (Chapter 7), 2011 Bankr. LEXIS 2287, at *1 (Bankr. D.D.C. June 14, 2011).

"Where courts have employed section 1927, the attorney's behavior has been repeated or singularly egregious." *United States v. Wallace*, 964 F.2d at 1220. Furthermore, "[a]lthough a finding of bad faith is essential to the imposition of sanctions under a court's inherent power, the D.C. Circuit 'has not yet established whether the standard [for unreasonable and vexatious conduct

under section 1927] should be 'recklessness or the more stringent 'bad faith.''" *Huthnance v. District of Columbia*, 793 F. Supp. 2d 177, 181 (D.D.C. 2011)(quoting *LaPrade v. Kidder Peabody & Co*., 146 F.3d 899, 905 (D.C. Cir. 1998)). "Moreover, regardless of whether a bad faith or a recklessness standard applies, a finding of 'vexatiousness' under Section 1927, like a finding of litigation misconduct under a court's inherent power, must be supported by clear and convincing evidence." *Id.*

### C.  Inherent Power of the Court.

Courts have the inherent power to impose sanctions to achieve the orderly and expeditious disposition of cases. While other sanctioning mechanisms exist, such as Fed. Civ. P. 11 and 28 U.S.C.S. § 1927, their availability does not preclude the court from exercising its inherent power. Egregious misconduct may warrant the extreme sanction of total dismissal, but for lesser wrongdoing a court may assess attorney's fees and costs. *Priority One Servs. v. W&T Travel Servs., LLC,* 987 F. Supp. 2d 1, 2 (D.D.C. 2013)

> Sanctions may be imposed under § 1927 when the attorney recklessly disregards a court order, thus unreasonably and vexatiously multiplying the proceedings… As held in *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1240 (11th Cir. 2007), "the phrase 'unreasonably and vexatiously' demands an objective analysis and . . . § 1927 does not require a malicious intent or a bad purpose." The attorney's subjective bad faith is not a necessary prerequisite to a § 1927 award: the inquiry is whether the attorney's conduct, viewed objectively, shows that she acted unreasonably and vexatiously. *Id.* Accordingly, "objectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly and malevolently." *Id.* at 1241.

*In re Rosebar,* 505 B.R. 82, 89 (Bankr. D.D.C. 2014).

### D.  Standard for dismissal pursuant to Fed. Civ. P. 37.

Under the Federal Rules of Civil Procedure, a Court may award sanctions when a party fails to respond to interrogatories, fails to respond to requests for production, and fails to preserve electronically stored information. Fed. Civ. P. 37(d)(1)(A)(ii) and 37(e.) The sanctions may

4

include awarding a default judgment in favor of the adversely affected party. Fed. R. Civ. P. 37(d)(3) and 37(2)(C.) There are three justifications that support a default judgment sanction for misconduct in discovery: (i) the adversely affected party has been so prejudiced by the misconduct it would be unfair to require him to proceed further in the case, (ii) the misconduct of the errant party has caused prejudice to the judicial system, or (iii) the sanction is necessary to deter similar misconduct in the future. *Webb v. District of Columbia,* 146 F.3d 964, 971 (D.C. Cir. 1998) (*citing Shea v. Donohoe Construction Company*, 795 F.2d 1071 (D.C. Cir. 1986)). The existence of these circumstances, to warrant granting a default judgment, must be established by clear and convincing evidence. *Shepherd v. ABC*, 62 F.3d 1469, 1472 (D.C. Cir. 1995).

## II.      FACTUAL BACKGROUND

### A.  History Of Discovery Procedures in this Matter.

Plaintiffs initiated discovery in this matter by propounding upon PEPCO their first set of discovery requests on or about May 17, 2021, and now, nearly a year and a half later, discovery has come to a close on October 14, 2022. (Gugino Decl. ¶3; Order at 1, July 29, 2022, ECF No. 61.) Over the past year, Plaintiffs have been forced to send out numerous deficiency letters, repeated requests for production, and even filed a Motion to Compel, yet PEPCO continually refuses to comply with its duties in discovery. (Gugino Decl. ¶3-23; Finney Decl. ¶) A detailed timeline of the discovery procedures in this matter is attached hereto as **Exhibit A**.

As demonstrated in the timeline **Exhibit A**, discovery in this matter has been unnecessarily arduous. (*See* Ex. A; Gugino Decl. ¶¶3-22 and Ex. 1-16.) Defendants have repeatedly failed to provide responsive answers to the First Set of Discovery, and Second Set of Discovery, and have completely frustrated Plaintiffs' various good faith, detailed and repeated attempts to request that Defendants cure the deficient responses. (Gugino Decl. ¶23.) In short, the responses have been (a)

non-responsive, (b) filled with misdirection and obfuscation, (c) indicating spoliation, and (d) direct, knowing and repeated falsehoods to counsel and the Court. These discovery abuses continue through the writing and filing of this motion.

Additionally, there are specific issues that have arisen throughout this discovery process that have needlessly increased the cost of this litigation and are blatant abuses of discovery. First Mr. Freeman made explicit and blatant misrepresentations to this Court concerning the grate and employees that worked on the same, specifically, that "**Pepco canvassed many different people to try to identify the particular person who either repaired it or was supervisor at the time when it was repaired on site and we came up empty**" and represented to the Court that they had specifically questioned Gladden, when, in fact, they had not and which information was quickly discovered upon questioning Gladden and Green, *and other PEPCO employees* under oath. (Telephonic Status Conference Tr. 14:14-15:5, Apr. 27, 2022. ECF No. 62; Gladden Dep. 12:22-14:7, Sept. 20, 2022. ECF No. 70; Green Dep. 24:8-25:2, July 14, 2022. ECF No. 67.) Second, PEPCO spoliated evidence by making documents relevant to this proceeding "unavailable," after it had notice of Mr. Shenton's claims against PEPCO, specifically documents related to the grate, notes maintained by the department that repairs the same and documents concerning any other access made to this grate by PEPCO employees leading up to the incident. (Deen Dep. 62:20-63:6, 64:7-12, 68:25-69:2, 69:3-70:9, 102:12-17, 103:6-16, and 105:20-106:6, June 7, 2022. ECF No. 66; Money Dep. 00:11-22, July 28, 2022. ECF No. 68.) Further, PEPCO refused to comply with Plaintiffs' discovery requests seeking information as to when these documents were destroyed or made unavailable. (Gugino Decl. Ex. 14 Interrog. 7 and 10.)

Third, PEPCO has produced voluminous amounts of entirely irrelevant discovery documents, for which Plaintiffs' counsel spent hours reviewing, and valuable deposition time

questioning witnesses on the subject matter of these irrelevant documents. (Gugino Dec. ¶30-33; Burgher Dep. 50:7-51:22.) Fourth, PEPCO has marked most of its production as "CONFIDENTIAL," when several of the documents are very clearly NOT confidential. In fact, over one thousand pages marked confidential, are public records. (Gugino Decl. ¶31-33.) Fifth, PEPCO has continued to claim documents are protected by the attorney-client privilege, however deposition testimony has revealed that these documents clearly are not protected by the attorney-client privilege under the law. (Money Dep. 86:11-87:13.) Finally, several issues occurred when attempting to schedule depositions in this matter, including the repeated last minute cancellation of Plaintiffs' expert.  (Gugino Decl. ¶¶34-39 and Ex. 18; Gibson Decl. ¶13 and  Ex. 24.)

**B. Identifying Who Repaired the Grate: Anthony Green and Michael Gladden.**

By far the most egregious abuses of discovery in this matter are Defendant's refusal to identify the individuals who repaired the Grate and Mr. Freeman's blatant misrepresentations to this Court. In short, Mr. Freeman originally claimed that "Gladden" and "Green" did not repair the Grate at the March 7, 2022 conference and Defendants refused to confirm the fact that Gladden and Green did repair the grate until the Deposition of Andrew Deen on June 17, 2022, over a year after Plaintiffs initially requested the identity of the individuals who repaired the Grate[1]. (Gugino Decl.¶27; Deen Dep. 21:5-25.)

Plaintiffs first requested this information on May 17, 2021, in Interrogatory No. 3 which stated "[i]dentify the individual(s) who repaired the broken latch on the Grate." (Gugino Decl. Ex. 1 Resp. to Interrog. 3.) On June 21, 2021, Defendant responded  simply that "…its agents repaired

---

[1]Even when PEPCO's representative initially identified Gladden as the person who performed the repair in deposition he insisted that they are unable to provide any contact information for Mr. Gladden, despite the fact that Mr. Gladden was a former employee of Pepco (see excerpt from Deen Deposition, *infra,* (Deen Dep. 21:5-25.)) PEPCO continued in their insistence that they had no contact information for Gladden or Green (as they had both retired since the inspection), but then hours later – after promised additional discovery and sanction on the issue – produced the contact information.  Clearly the information which had been sought for over a year had been withheld or no search had ever been conducted for the information, both violations of the Civil Rules and express instructions of this Court.

the broken latch…" notwithstanding the fact that "identify" required Defendant to state the full name, last known employer, title, and last known address of the person. *Id*. On August 25, 2021, Plaintiffs notified Defendant this response was deficient, and reiterated the request to identify the individuals who repaired the latch on the Grate. (Gugino Decl. Ex. 2.) It was not until December 1, 2021 that Defendant supplemented its response to Interrogatory No. 3 and simply referred to a document marked Bates-numbers PEPCO 0045-0046 CONFIDENTIAL (the "General Shops Form.") (Gugino Decl. ¶25-26 and Ex. 5 Resp. to Interrog. 3.) The General Shops Form offers only the following handwritten notation as follows:

| Name | ID No. |
|------|--------|
| 1. Gladden | 60938 |
| 2. Green | |

(Gugino Decl. ¶25.) Plaintiffs, again, on January 7, 2022, informed the Defendant that this response to Interrogatory No. 3 was deficient and requested Defendant comply with the Discovery Requests and identify the **full identity of these individuals** (Gugino Decl. Ex. 8 at 3.) Receiving no supplemental response to Interrogatory No. 3, Plaintiffs requested a discovery conference with the Court which occurred on March 7, 2022. (Gugino Decl ¶12.) At the first discovery conference, Mr. Freeman represented to the Court that, in fact, PEPCO does not know who Gladden is (Gugino Decl. ¶27.) The Court then authorized Plaintiffs to file their Motion to Compel. (Order, ECF No. 53.) Plaintiffs in their Motion to Compel argue that the response to Interrogatory No. 3 is deficient and call the Court's attention to the fact that (i) there is a last name and an employee number for "Gladden", and (ii) yet PEPCO nevertheless continued to claim it cannot identify Gladden. (Motion to Compel, ECF No. 54 at 5.) Defendant completely, and utterly, failed to respond to Plaintiffs' argument in any way in their Memo in Opp. (Memo in Opp, ECF No. 55 at 3-4.)

8

Plaintiffs reiterated their arguments related to Interrogatory No. 3 in their Reply. (Reply, ECF No. 56 at 2-3.)

After the written briefing on the Motion to Compel, this Court held a hearing on April 27, 2022 wherein Mr. Freeman changed the narrative from not knowing at all who Gladden was to representing to the Court that (i) PEPCO had "canvassed many different people" to try to determine who repaired the latch, including Gladden, and he "doesn't have any memory of that", and (ii) "Mr. Gladden does not know who actually repaired the latch." Mr. Freeman knowingly, affirmatively, and repeatedly misrepresented to this Court that Gladden did not repair the latch on the Grate, and that the identity of the individuals who repaired the latch were unknown despite PEPCO's many efforts to investigate:

> MR. FREEMAN: … What I have and what I gave to them the day after you signed the protective order, Your Honor, was the form that said, had to do with two names, last names only. One of which had an ID number of people who were cousins at a job briefing. **It does not say and is not the person that they asked for who repaired the latch** after the fact which we have stipulated that they did repair it. Last name is Gladden. It's not illegible. It contains an ID number which is not illegible, but it's not because we do not know and **Mr. Gladden does not know who actually repaired the latch**. We don't know that. And nobody has a memory at this point of who did.

(Conference Tr. 8:8-16, emphasis added.) Mr. Freeman made this statement to the Court, despite the fact in PEPCO's First Supplemental Interrogatory Responses, PEPCO directed Plaintiffs to the General Shops Form when requested to identify the individuals who repaired the Grate. (Gugino Decl. ¶¶25-26 and Ex. 5 Resp. to Interrog. 3.)  Mr. Freeman went on to reiterate that "[w]e do not at this point in time or ever will know the specific person who repaired the latch…" (Conference Tr. 9:3-5.) When the Court asked Mr. Freeman to reconcile the inconsistency between the interrogatory response and his representations at the April 27, 2022 hearing, Mr. Freeman stated that:

MR. FREEMAN: Your Honor, this is Martin Freeman. What we said was with respect to who repaired it see this document. We did not say and do not say today that Mr. Gladden is the person who conducted the repairs. **He doesn't have any memory of that**, and so no other documents. There's nobody else who has memory of it. And I'm sorry that that is so, but we do know that it was repaired. We do know it needed repair and we have stipulated to those two facts.

THE COURT: **Are you saying that you specifically queried <u>Gladden</u> to find out** whether he had performed the repair and he said he didn't recall or didn't do it?

MR. FREEMAN: **We not only questioned him, Pepco canvassed many different people to try to identify the particular person who either repaired it or was supervisor at the time when it was repaired on site and we came up empty**. I'm sorry, we did.

(Conference Tr. 14:14-15:5, emphasis added.) Incredibly, this was a misrepresentation to the Court, as **Mr. Gladden was <u>*never*</u> questioned by Mr. Freeman, or anyone at PEPCO**, on this matter. **Mr. Gladden had absolutely no contact with Mr. Freeman before Plaintiffs subpoenaed him to testify in July or August or anyone at PEPCO** about this matter until Plaintiffs subpoenaed Mr. Green for deposition testimony in the end of June or July.[2] In his deposition on September 20, 2022, Mr. Gladden testified as follows:

Q. Okay. Have you spoken to Mr. Freeman before the notice of this deposition, or the subpoena to testify was received?
A. Yeah, he called me and let me know that it was happening. And that was about it.
Q. Would they have been maybe in July or August?
A. I'm not sure. It was a couple months, yeah.
Q. Okay. Before that, had you spoken to Mr. Freeman before?
A. No.
Q. Before you received the subpoena to testify, or before you spoke to Mr. Green[3], when he received his subpoena to testify, had you heard about this case before?
A. No.
Q. So when did you first learn about this case?

---

[2]     It is important to note that, despite Mr. Freeman's express representations to the contrary, the personnel in the General Shops department at Pepco knew **<u>instantly</u>** who repaired the grate and who "Gladden" and "Green" were when we finally were able to ask the question of these personnel under oath at a deposition.  These are things Mr. Freeman persistently in discovery and to this Court said Pepco did not know after diligently inquiry – and indeed told this Court that Gladden and Green had not repaired the grate after the accident and had no memory of the grate or incident in question, all 100% untruths.

[3]     Mr. Green received his Subpoena to testify on June 30, 2022 (*see* Gugino Decl. Ex. 17).

A. Well, I think Mr. Green notified me and told me about it, something similar about the case, that he was notified. And he wanted to know if I been notified. And I told him, no, I hadn't heard anything about it.

Q. This would have been after he received his subpoena to testify?

A. Yes.

**Q. Okay. So before that, had any PEPCO employees or anyone on behalf of PEPCO reached out to you last year, asking you about the repair of the grate at issue in this case?**

**A. No.**

**Q. Did they ask you if you had any memory of the repair of the grate at issue in this case?**

**A. No. Nobody asked me from PEPCO.**

(Gladden Dep. 12:22-14:7.) Additionally, during the deposition of PEPCO's corporate representative, Andrew Deen, Mr. Deen testified that:

Q.   Do you know if anybody has spoken with -- anybody from Pepco has spoken with Mr. Gladden or Green about Mr. Shenton's accident?

A.   Not that I'm aware of.

Q.   Do you know if anybody has spoken with Mr. Gladden or Green about this litigation?

A.   Not that I'm aware of.

(Deen Dep. 119:2-9.)

At the April 27, 2022 hearing, this Court ordered that if Plaintiffs through depositions were "able to determine or discovery who in fact did the repair contrary to what [they're] being told by defense counsel then I think that would be fair that you should be compensated for that…" The Court further reiterated "I would make them pay for the cost of you having to do what you shouldn't have had to do." Specifically, the Court stated to Plaintiffs' counsel that:

THE COURT: …I can't stop you from taking the deposition of whoever you think could lead you to find out who it was who made the repair. And I would tend to agree with you that if in fact you go down that road and you're able to determine or discover who in fact did the repair contrary to what you're being told by defense counsel then I think that would be fair that you should be compensated for that. I don't have a problem with that. Because I agree that if it's able to be determined through the defense and they can advise you of that and therefore avoid you having to go down that road that should occur, but he's saying he's done that. Based upon what he's done he can't determine who it was. But if you want to conduct the discovery you say you want to do conduct and you're able to determine what you

11

believe you can determine if that becomes reality then I would tend to agree. I would make them pay for the cost of you having to do what you shouldn't have had to do.

(Conference Tr. 18:21-19:12.) The Court further reiterated this point by stating to Plaintiffs' counsel "[a]nd as I say if you're right and that discovery does disclose who did the repair then I would make them pay for you having to do what you did." (Conference Tr. 19:23-25.) On May 17, 2022, Mr. Freeman indicated to Plaintiffs' counsel by email that PEPCO's employee listings do not show any employee whose last name is Gladden. (Finney Decl. Ex. 19.)

In the deposition of PEPCO's corporate representative Andrew Deen, on June 7, 2022, the full name of Mr. Gladden, and the name of Mr. Green, was thereafter simply and quickly identified as Michael Gladden and Anthony Green just over an hour after the Deen deposition adjourned. (Deen Dep. 96:12-23.) Additionally,  Mr. Deen confirmed that Mr. Gladden and Mr. Green were in fact the individuals who repaired the Grate:

> Q.   How did you learn Michael Gladden and Anthony Green's first names?
> A.   I asked John Cleary.
> Q.   And you're telling me that those two people were, in fact, the two individuals who responded to the site, investigated and repaired the grate in January of '17 in question in this case; is that correct?
> A.   Yes.
> Q.   And how did you determine that?
> A.   By talking with John Cleary.
> Q.   So John Cleary had a personal recollection of that, or he knew just by looking at the form?
> A.   He knew that by looking at the form, and the fact that Michael and Gladden were usually the gentlemen that would always go out and do this repair work

(Deen Dep. 97:5-22.) However, Mr. Deen was unable to provide any contact information for Mr. Gladden, despite the fact that Mr. Gladden was a former employee of PEPCO:

> A.   No.  No.  No.  We don't have access to find out what his number is because he had since retired.
> Q.   Okay.  And when he left, he left no forwarding address, he left no telephone number, he left no information, email address?
> A.   No.

12

Q.   Did you have a current address for him when he worked for the telephone company – or for Pepco, I mean?
A.   No, not that we were able to obtain.
Q.   So this man -- so how long did Mr. Gladden work for Pepco?
A.   Unsure.
Q.   Okay.  But whether one month or for 30 years, you don't have addresses?  Like when you do payroll, you don't know the addresses of your own employees?
A.   We do know our addresses of our employees, but a lot of our systems have changed since we merged with Exelon.

(Deen Dep. 21:5-25.) Additionally, the phone number for Mr. Gladden was known to a former PEPCO employee, Mr. Green, who refused to provide Plaintiffs' counsel when Plaintiffs asked for it in deposition. (Green Dep. 56:19-25.) Mr. Green also testified that it would have been easy to figure out the identity of a PEPCO employee based on that employee's ID number (Green Dep. 11:19-22.) Mr. Green further testified that he had not spoken to Mr. Freeman before July of 2022 and further testified that prior to the deposition in July he had *never* spoken to *anyone* PEPCO about this case. (Green Dep. 24:8-25:2.) Likewise, Mr. Burgher, when deposed, testified that, prior to June of 2022, neither Mr. Freeman **nor anyone from PEPCO** had reached out to him to discuss this case nor did he know anything about this case prior to then. (Burgher Dep. 9:25-10:22, July 29, 2022. ECF No. 69.)

Nevertheless, Defendant did not identify Mr. Gladden until June 17, 2022 by email to Plaintiffs' counsel only hours after Plaintiffs promised additional discovery on the issue and sanctions for withholding information PEPCO obviously knew. It is also worth mentioning that Mr. Freeman represented to this Court that "…if counsel wants to take Mr. Gladden's deposition and have them say I don't know anything other than what you're looking at on that piece of paper that's fine. I'm representing to him and to you that that is all he will be able to say." (Conference Tr. 11:17-21.)

After over a year of discovery abuse and sending Plaintiffs on a wild goose chase requesting PEPCO identify the name and contact information of the individual(s) who repaired the grate at issue in this action, Plaintiffs were finally able to take Mr. Gladden's deposition on September 20, 2022.  Mr. Gladden provided critical testimony in support of Plaintiffs' claims and completely and entirely contradicted Mr. Freeman's direct representations to this Court. Specifically, Mr. Gladden testified that in his 39 years working for PEPCO, he repaired about twenty grates per year and of those "repairs" about a dozen were simply grates that had not been properly locked. (Gladden Dep. 11:4-9, 48:16-50:1.) Interestingly, Mr. Gladden further testified that based on his knowledge and experience only PEPCO employees have a key to open such grates and based upon his review of the photos of the grate prior to the grate's "repair" it appears that the Grate simply was not locked by the PEPCO employee who opened it last. (Gladden Dep. 21:8-22:20.)

**C. PEPCO has spoliated the evidenced by destroying or making "unavailable" discoverable documents and Plaintiffs request this Court make an adverse inference.**

During the deposition of PEPCO's designated representative, Mr. Deen, it came to light that most of PEPCO's electronic records either were destroyed or rendered impossible to access during the pendency of this claim, including records relevant to this litigation. On or about March 23, 2016, PEPCO merged with another company, the Exelon Corporation. (Gugino Ex. 14 at 5.) Sometime in 2017 or 2018 – *after Pepco was placed on notice of the claims of Mr. Shenton herein* - the internal record keeping software used by PEPCO was retired and the files were made "unavailable:"

> A.   So I'm trying to look at the old system of record, which would have been WMIS, but that has since been retired when we moved over – when we merged with Exelon.
> Q.   Okay.  There's an old recordkeeping system called WMIS?
> A.   Yes.

14

> Q.   Spell that, please.
> A.   W-M-I-S.
> Q.   And that was switched over when you were bought by Exelon?
> A.   That is correct.

(Deen Dep. 62:20-63:6.)  This switch occurred sometime in 2017 or 2018:

> Q.   And when was that switch made?
> A.   I want to say 2017 -- 2016, I – I mean, 2017 or 2018.

(Deen Dep. 68:25-69:2.) The first letter sent to PEPCO by Mr. Shenton was dated November 30,

2016, and received by PEPCO on December 12, 2016, as testified by Ms. Money (Money Dep.

48:17-49:5.) In this letter, Mr. Shenton describes his trip and fall and outlines his claim against

PEPCO in an attempt to settle the matter. PEPCO acknowledged receipt of these communications

on December 28, 2016 (Amended Complaint ¶41, Exhibit C). However, despite being on notice

of a potential lawsuit, PEPCO failed to preserve records relative to Mr. Shenton's claim:

> Q.   Okay.  So shortly after this accident occurred, which was on October 13th of
> '16, Pepco destroyed all the records that would show whether or not prior job orders
> had been made with respect to the southeast corner of Pennsylvania Avenue and
> Northwest; is that correct?
> MR. FREEMAN:  Object to form.
> A.   No.  I wouldn't necessarily say they were destroyed, but they -- we no longer
> have access to them.
> BY MR. FINNEY:
> Q.   Okay.  And why is that?  I don't understand.  No one kept a backup of these
> records?
> A.   We don't maintain that system anymore, as we moved to the new one.
> Q.   And there's no way to -- and was information exported or imported or
> converted into your new system, or the historical information about job orders prior
> to 2017 or 2018 incorporated into your new system?
> A.   No.
> Q.   So all data relating to prior complaints, incidents, and job orders after 2018
> were -- are no longer accessible?
> MR. FREEMAN:  Object to the form.
> A.   We tried to look.
> MR. FINNEY:  Go ahead and re-read the question, Wendy.
>  (The record was read.)
> A.   Yes; no longer acceptable -- accessible.

(Deen Dep. 69:3-70:9.) In addition to the record system WMIS, PEPCO also kept records in another software called Maximo, however those records have also been made unavailable by PEPCO:

> Q.   What is Maximo Work Management  system?
> A.   Maximo?
> Q.   Yeah.
> A.   I believe it was the predecessor to WMIS, but I'm not a hundred percent sure.
> …
> Q.   And did you look at the Maximo Work Management system in addition to attempting to access documents from WMIS, to determine whether or not there was defective conditions relating to this particular manhole and grate prior to the accident that occurred in August of '16?
> A.   We don't have access to the Maximo database since it's been retired.
> Q.   When was it retired?
> A.   I'm not sure.  That's something I definitely don't know.

(Deen Dep. 102:12-17, 103:6-16.)

> Also, PEPCO destroyed email records that may have been relevant to this proceeding:

> Q.   Okay.  And did you, as a part of your records search for this litigation, search those emails prior to the 2016 incident to ascertain whether or not any such report had been made?
> A.   From what I know about our retention  policy for -- emails is only two years.
> …
> Q.   Now, with respect to that manhole, if I would like to find information about prior reports of a defective condition to – assuming that existed.  They may not have.  Assuming they existed, then you've already told me that all the emails from that time frame, from '12 through '17 have been destroyed; is that --
> A.   Yes.
> Q.   Okay.  And we also know that all the information in the WMIS system has also been  destroyed?
> A.   Yes.

(Deen Dep. 64:7-12 and105:20-106:6.) Based on Mr. Deen's testimony, it is clear that PEPCO spoliated evidence sometime in 2017 or 2018, *after receipt of Mr. Shenton's November 30, 2016 letter* which put PEPCO on notice of his claim. Plaintiffs tried to ascertain the specific date the various systems, WMIS and Maximo, were "retired" and the records made unavailable, however the Defendants have refused to provide this information:

7. Identify the date(s) PEPCO deleted, destroyed, and/or archived any data from Maximo.

ANSWER: Pepco is presently researching to determine whether there is anyone with the company who can respond to this Interrogatory, and will supplement this response as soon as possible. Object to the use of the word "destroyed" insofar as such use connotes a wrongful act.
…
10. Identify the date(s) PEPCO deleted, destroyed, and/or archived any data from WMIS.

ANSWER: Pepco is presently researching to determine whether there is anyone with the company who can respond to this Interrogatory, and will supplement this response as soon as possible. Object to the use of the word "destroyed" insofar as such use connotes a wrongful act.

(Gugino Decl. Ex. 14 at 6-7.) The Second Discovery Responses were never supplemented. PEPCO

also indicated that it would produce a "Records Retention Schedule which became effective

following Pepco's merger with Exelon" upon Plaintiffs' request, Plaintiffs requested said

document, however it was never produced. (Gugino Decl. Ex. 14 at 7.)

Plaintiffs also attempted to ascertain what other databases may have existed at PEPCO and

contained relevant information, however Defendants refused to answer these questions as well:

5. Identify all software, software databases, digital archives, programs, data readers, utilized by PEPCO including, but not limited to, Maximo and WMIS.

ANSWER: Overly broad. An onerous request. Upon advice of counsel, this interrogatory requires no answer.

(Gugino Decl. Ex. 14 at 5-6.) Based on deposition testimony, it appears that in addition to WMIS

and Maximo, the claims department had its own software it used to process claims. (Money Dep.

25:17-26:24.)  Additionally, it was the policy of the PEPCO claims department to retain records

related to potential litigation:

Q.   Okay.  When you had a claim, was there an internal instruction or understanding that you had to retain all of your communications for purposes of litigation?
A.   Yes.

17

> Q.   So if you thought that Mr. Shenton's claim was still open or that he might file suit, you had that understanding, that you were not to destroy any records relating to that claim; is that correct?
> A.   Yes.
> Q.   And did you follow that instruction as of the time you left the company?
> A.   Yes.
> Q.   You would not destroy that e-mail that you sent to underground?
> A.   No.
> Q.   You had retained it?
> A.   Yes.

(Money Dep. 41:10-23.) Despite the fact that PEPCO had an express policy not to destroy documents that relate to potential litigation, PEPCO nevertheless destroyed and/or made documents relevant to this proceeding unavailable after it was put on notice of Mr. Shenton's claim.

> *a.   The depositions in this matter revealed numerous documents that should exist, that have been requested, which PEPCO has failed to produce.*

Plaintiffs know that there must be documents in the WMIS, Maximo, and claim's system archives which are relevant to this proceeding and have been requested in discovery. Mr. Deen testified that there is likely an email that exists which communicates that a complaint has been made against PEPCO which is sent to the relevant department at PEPCO. (Deen Dep. 63:7-25.) However, that email would have been destroyed:

> Q.   Okay.  So you can say definitively that you did not search the emails that would have then been generated as a result of complaints prior to the incident because they would have been destroyed before this litigation was commenced?
> …
> A.   Yeah.  If there was an email, then yes it would have been destroyed since there's only a two-year retention policy.

(Deen Dep. 64:13-65:17.) Additionally, Mr. Deen testified that there is no way to access previous job orders for the Grate:

> Q.   Okay.  And did you search the job orders to see if there had been any prior job orders relating to this particular manhole and this particular grate?

18

A.   So we switched systems.   And we don't have access to that old system anymore, which is WMIS.

(Deen Dep. 68:18-24.)

Ms. Money, the PEPCO employee who investigated Mr. Shenton's claim, indicated that in addition to maintaining an electronic file of all claims, she also maintained a physical file, however this physical file has not been produced:

Q.   Okay.  And do you know how long the physical files were retained under the retention policy of Pepco?
A.   I believe that they were retained forever, especially files regarding the claims.
Q.   And why is that?
A.   Because they -- they're -- they just
are not destroyed.
Q.   And so there's no scan of those files, though; it's just whatever you had in the electronic database and whatever you printed out would be in the physical file; is that right?
A.   To my knowledge, yes.

(Money Dep. 44:8-20.) This physical file included copies of all emails related to the claim, and notes of any conversation Ms. Money had with anyone regarding Mr. Shenton's claim:

Q.   But every phone call you made you would make -- if you talked to the City, for example, of Washington, DC, would you make a recording of that, meaning a note of that in the database?
A.   I couldn't --
MR. FREEMAN:  Object to form.
A.   I would put a document -- I would input into the claims system and I would print out a copy and put it into my file.
BY MR. FINNEY:
Q.   Every phone call?
A.   Every phone call, yes. I always did that.
Q.   Is it safe to say for a claim that took this long to process that you were, in fact, doing an investigation, talking to people about it, whether in the company or outside the company?
A.   I was investigating, yes.
Q.   Meaning you were talking to other people?
A.   Or waiting for documentation.
Q.   From the City or an internal department at Pepco or something?
A.   From within Pepco.
Q.   From within Pepco. And when you had internal conversations of people requesting documents, did you make a note of that in the database?

19

A.   Yes.  It should be in -- yes.
Q.   Okay.  So my question is, during this ten weeks of -- of Mr. Shenton not receiving a response, it wasn't that you were ignoring it, you were doing things?
A.   Yes.
Q.   And each of those things you were doing, you would make a note of in your database?
A.   Yes.
Q.   And then, not only was it in the electronic database, but you would print it out and you would put that in a physical file?
A.   Yes.
…
Q.   Okay.  And if they would call you, you would type up those notes in the database?
A.   Yes.
Q.   And you would then -- it would be in the database permanently, correct?
A.   Correct.
Q.   And you would then print that out and put that in the physical paper file as well; is that correct?
A.   Correct.
Q.   Okay.  And that, in fact, happened in this instance, the Shenton claim; is that correct?
A.   Like I said, I don't have the file in front of me, but if I recall, yes.

(Money Dep. 72:20-74:12; 81:9-23.)  Additionally, Mr. Burgher testified that his department, underground lines, would receive electronic notifications if a manhole needed repaired:

Q.   How do they get that information to you?
A.   By computer now.  All the trucks have computers on them now.
Q.   So they send it through -- is it like through an e-mail?  Is it through a pager?  Is it --
A.   We have a computer.  Let's say computer number one is assigned to my truck 573.  I'm in the NW area I think where this took place. I would get that dispatched to me over the computer because I'm in the area and I take care of that.
Q.   Is it basically a software program that your computer is logged on to and it pops up as a notification on there or something?
A.   Yes.

(Burgher Dep. 36:3-18) Mr. Gladden testified that the General Shops department maintained a physical file of repairs done to grates:

A.   We had a folder.  Once the damage was repaired -- later on, they came out with one that we marked what we did on it, and we had a folder in the shop that we put them in at that day.
BY MS. GUGINO:

Q.   Was there a specific folder just for repair grates, or was it the same folder for all of the work that you did all the time?
A.   There was one, I think, particularly for grates.
Q.   For ones that had been repaired?
A.   Yes.
…
Q.   Well, so the file that has the information on the damaged grates and the repairs, was that kept in someone's desk?
A.   No.  It was a book on top of the cabinet. We put it in.  And if we wanted to refer to it, we could just go into the book and find it and let them know whether or not it was or not.
Q.   Okay. In the general shops department?
A.   Right.

(Gladden Dep. 33:6-17; 34:4-14.) Mr. Freeman has indicated that this notebook or file no longer exists and thus cannot be produced:

MS. GUGINO: No.  We've also asked for repairs of other grates.
MR. FREEMAN: Yeah. I think you saw our response to that. As far as the notebook is concerned, we've given you everything we have. We do not have a notebook.
MS. GUGINO: Okay; or a file folder that Mr. Gladden is referring to.
MR. FREEMAN: We don't have that, either. We just don't.  We can't make something up that's not there anymore.

(Gladden Dep. 35:2-13.)

In sum, there were emails, WMIS files, Maximo files, claims files, and physical documents, which may have included information such as a notice to PEPCO that the Grate at issue in this case was damaged and reported prior to Mr. Shenton's fall, however these records have been destroyed and/or made unavailable by PEPCO after the initiation of Mr. Shenton's claims. Additionally, there are documents, electronic files, and emails related to the investigation of Mr. Shenton's fall which may indicate what was wrong with the Grate (i.e. that an employee recently worked on the Grate and failed to lock it) which have been destroyed and/or made unavailable by PEPCO.

**D. Defendant's Misleading Discovery Production.**

Next, as mentioned in the April 27, 2022 hearing, PEPCO produced 1,671 pages of discovery documents, the bulk of that production being five nearly identical *publicly available* reports created by PEPCO for the District of Columbia related to manholes (the "Reports,") and two presentations created by PEPCO related to the inspection of manholes (the Presentations.") (Gugino Decl. ¶30-32; Conference Tr. 7:7-25.) The combined total pages of these aforementioned documents produced is 1,596. (Gugino ¶31.) Plaintiffs' counsel extensively reviewed these documents for information related to the process by which PEPCO maintained its manhole covers, what documents may be discoverable related to the inspection of manholes, and who at PEPCO may have knowledge of the inspection of manholes. (Gugino Dec. ¶30-33.) This led Plaintiffs to take the deposition of Mr. Burgher whose name appeared in the two presentations related to the inspection of manholes. (Gugino Decl. ¶33.)[4]

While Plaintiffs' counsel was questioning Mr. Burgher as to some of the processes mentioned in the Reports and Presentations, Mr. Burgher cut Ms. Gugino off to inform her that the Reports and Presentations had **absolutely <u>nothing</u>** to do with the Grate:

> Q.   So you're saying the 10,000 a year, that was in the central business, Adams Morgan -- it was a different number if you were out in Maryland or something like that?
> A.   Maryland did not require.  They started to require it at the end of -- when I was leaving there.  And the numbers -- I can't remember what they were.  But they weren't what they wanted in the district. **Now, I'm going to explain something else to you here now. <u>That's not considered a <u>manhole. That's a grating hole.</u></u>**
> Q.   Okay.
> A.   That didn't fall under the manholes in the central business district. They were talking about the concrete or the cast iron manhole covers.
> Q.   Okay.
> A.   The transformer holes in the beginning of this was supposed to be a separate thing. Now, when we were out there, we would inspect it. If we saw a problem like

---

[4] Additionally, Mr. Deen confirmed that Mr. Burgher ran the manhole inspection program. (Deen Dep. 16:1-5.)

that, we corrected it.  If we were going to lunch and we saw a problem there, we would correct it.  Okay?

Q.   Well, we were -- this is the document we were given by Pepco related to the policies of those. How did you refer to that? It's not a manhole -- it's not a concrete manhole, it's a what?

A.   That's a transformer grating cover.

Q.   A transformer grating what?

A.   Cover.

Q.   Cover.

A.   Or a transformer grate.

Q.   Okay. Is there -- are there other policies or protocols or directions given by the Commission related to those transformer grating covers?

A.   I can't answer that. I don't know.

Q.   Okay.

(Burgher Dep. 50:7-51:22.) Mr. Gladden in his deposition confirmed that the Grate at issue in this case would not be considered a manhole:

Q.   Okay.  Mr. Gladden, what would you call this grate in this picture?

A.   I guess I would just call it a regular, I don't know, sidewalk grating.

Q.   A sidewalk grate? Is it considered a manhole?

A.   No.

Q.   Is it --

A.   I mean, I wouldn't -- I wouldn't know whether or not the company classified it as a manhole. They do have transformers in some of them.

Q.   Do they sometimes refer to this as a transformer grate?

A.   Not when they asked me to go repair it. They just report it as a damaged grating.

Q.   A damaged grating. So if you look at the circular manhole in the back, would that be what you refer to as a manhole?

A.   If that's a solid cast, I would say yes.

Q.   Okay.

A.   Looking at it from here, it looks like it has slats in it.  I know, later on, they did make new manhole covers that was, I guess, breathable, (inaudible).  So I guess --

THE REPORTER:  What was the second word?  Breathable and what?

A.   When they cut slats in the new manhole grating -- I mean, lids, so that, I guess, there would be an air exchange. But just looking at it from here, I couldn't really say that was a manhole lid or what.

(Gladden 18:1-19:11.) In addition to producing over a thousand pages of misleading documents that dealt with "manholes" rather than transformer gratings, PEPCO also produced a seven page "Manhole Inspection Report with Graphics" which purportedly was the result of inspecting the

Grate on September 24, 2012. (Gugino Decl. Ex. 5 and Ex.12 at 2.) However, it is clear from Mr. Burgher's testimony that the Grate at issue in this case was *not* part of the manhole inspection program, as ***it was not a manhole cover.*** (Burgher Dep. 50:7-51:22.) Additionally, from Mr. Gladden's testimony, it appears that the inspection report was actually related to a manhole cover with slats. (Gladden 18:25-19:11.) Thus, even the documents that PEPCO did produce were not responsive, not relevant to the grate at issue in this action and nothing more than a continuation of the wild goose chase that Plaintiffs were sent on for over a year in this litigation.

### E.  Public Documents Designated "Confidential" in Violation of Protective Order.

The parties in this matter agreed to a Protective Order so the Defendants would produce discoverable documents, the protective order provides that the following documents may be marked confidential:

> …(i) any **<u>non-public</u>** business record which directly contains the practices, procedures or protocols of the construction, maintenance and repair of PEPCO's electrical distribution systems and/or underground electric utility values, and/or (ii) any **<u>non-public</u>** business record indicated the location, routing and care of primary feeder lines, substation locations and/or care of electrical distribution interconnections.

(Protective Order, ECF 50 at 1, emphasis added.) The Defendants in this matter produced 1,671 pages of discovery documents, with 1,653 pages as being marked as "confidential." The Plaintiffs extensively briefed this issue in the Motion to Compel, specifically as it related to images of the public sidewalk, and this Court ordered the Defendants to reconsider their designation of certain materials as "confidential." (Motion to Compel, ECF 55 at 15-16; Order, ECF 57 at 1.) The Defendants removed the confidential designation from only the photographs that were taken by Mr. Shenton, photos of the public street taken by PEPCO remain marked confidential. (Gugino Decl. Ex. 12.)

Additionally, upon further investigation of this matter, Plaintiffs' counsel discovered that the 1,460 pages of Reports, which have been marked as confidential and which Mr. Freeman represented to this Court as proprietary protocols, are actually *publicly available* documents. (Gugino Decl. ¶31-33; Conference Tr. 23:4-9.) The six Reports produced (dated 2013 through 2015,) along with reports dating back to 2000 through the present, have been filed with the Public Service Commission of the District of Columbia in Cases Numbered FC991 and FC1119[5].

Therefore, the Reports and photographs taken by PEPCO, clearly do not fit the description of the documents protected by the Protective Order, as the Reports are publicly available business records and the photographs are of the public street. Thus, the designation of *public* documents as "CONFIDENTIAL" is in direct contravention to the terms of the Protective Order.

**F. Abuse in Claiming Attorney Client Privilege.**

Next, the Defendants have marked what appears to be the investigation file created by Ms. Money dated December 13, 2016 through February 12, 2018 as documents protected by the attorney-client privilege. (Gugino Ex. 6.) However, Ms. Money clearly testified that she never consulted with the legal department or a PEPCO lawyer until *after* a lawsuit was filed:

> Q.   Okay.  What was your relation to the legal department?  Did you report to the legal department, or how did that work?  Did you coordinate your investigations through the legal department?
> A.   No.
> MR. FREEMAN:  Objection to form.
> BY MR. FINNEY:
> Q.   Did you ever work with the lawyers in the company about these investigations?
> A.   If a lawsuit was brought against the company, yes, I'd have to work with the legal -- and it involved a claim, I'd have to work with the legal department.
> Q.   How about before a lawsuit was brought?
> A.   Before a lawsuit -- no.

---

[5] These documents are available to download  from the Public Service Commission's website at https://edocket.dcpsc.org/public/search/casenumber/fc991 and https://edocket.dcpsc.org/public/search/casenumber/fc1119.

Q.   So you don't -- you're not – your department, the claims department, is not part
of the law department?
A.   Well, it -- if I recall, we fell under the law -- the law department.
Q.   Did you report to a lawyer?
A.   No.  I reported to Olivia Grimes.
Q.   And she's not an attorney?
A.   No. We were -- the law department and claims was in the same group.

(Money Dep. 86:11-87:13.) This action was filed on May 19, 2019, over a year after the date of

the file which Defendants have claimed is covered by the attorney-client privilege. (Complaint for

Monetary Damages, ECF 1.)

## G. Repeated Problems Scheduling Depositions.

The Defendants' counsel in this matter twice canceled the deposition of Mr. Shenton's

expert witness Dr. Raklewicz at the very last minute, first the day before the deposition and second

four days before the deposition. (Gugino Decl. ¶¶34-39 and Ex. 18; Gibson Decl. ¶13 and  Ex. 24.)

First, the deposition was scheduled to occur on January 25, 2022. (Gugino Decl. ¶¶34-39 and Ex.

18.) Ms. Gugino forwarded Dr. Raklewicz's deposition fee to Mr. Freeman for payment on or

about January 10, 2022, this email was not responded to. *Id*. On January 24, 2022 Ms. Gugino

followed up with Mr. Freeman after being informed that the deposition fee had not been paid. *Id.*

That day, Plaintiffs were informed by Mr. Freeman's office that Mr. Freeman was in surgery and

could not attend the deposition. *Id*.

After that cancellation, with absolutely no prior notice, Plaintiffs asked Mr. Freeman to

coordinate deposition scheduling directly with Dr. Raklewicz, to avoid another last-minute

cancellation. (Gugino Decl. 40-41.) However, Mr. Freeman continued to schedule Dr. Raklewicz's

deposition through Plaintiffs, and the deposition was rescheduled to July 15, 2022, a date proposed

by Mr. Freeman on June 22, 2022 and tentatively set by Mr. Freeman and Ms. Gibson over a

telephone call, pending confirmation from Dr. Raklewicz's office. (Gibson Decl. ¶¶3-11 and Ex.

23 and 24.) Plaintiffs received confirmation from Dr. Raklewicz's office on June 24, 2022 and sent an email confirming the dates of all July depositions to Mr. Freeman on June 30, 2022. *Id*. A second email was sent to Mr. Freeman confirming the July 15, 2022 deposition date on July 5, 2022. *Id*. Nevertheless, Mr. Freeman waited until July 11, 2022 to inform Plaintiffs that he could not attend the July 15, 2022 deposition. (Gibson Decl. ¶¶13-14 and Ex. 24.)

Additionally, Mr. Freeman failed to provide Plaintiffs with an accurate phone number for Mr. Gladden. (Gibson Decl. ¶15-16.) To schedule the depositions of Ms. Money, Mr. Burgher, Mr. Gladden, and Mr. Green,  Plaintiffs reached out to the witnesses by phone and/or letter to propose dates and times for their depositions to be scheduled. (Gibson Decl. ¶3.) All witnesses, except Mr. Green, refused to contact Plaintiffs' counsel directly, and instead communicated their preferred dates through Mr. Freeman. (Gibson Decl. ¶8.) Despite having made contact with Mr. Gladden, Mr. Freeman failed to provide Plaintiffs with an accurate phone number for Mr. Gladden. (Gibson Decl. ¶8 and ¶15-16.)

This caused service of a subpoena upon Mr. Gladden to be extraordinarily difficult, as Mr. Gladden lives in a gated community. (Gibson Decl. ¶15-16.)  A process server may only get through the gated community and access Mr. Gladden's residence by calling Mr. Gladden upon arrival, however Mr. Freeman did not give Plaintiffs' Mr. Gladden's phone number and despite having made contact with Mr. Gladden, Mr. Freeman refused to assist Plaintiffs in serving Mr. Gladden. *Id*. Thus, Plaintiffs were forced to reschedule Mr. Gladden's deposition so Plaintiffs could serve Mr. Gladden his subpoena by the local county sheriff. However, Mr. Gladden failed to show up to the deposition scheduled for September 14, 2022 or communicate with Plaintiffs' counsel. (Finney Decl. ¶10-13 and Ex. 22.) Mr. Freeman refused to accept service of an amended

27

subpoena for Mr. Gladden's deposition to be rescheduled on a date Mr. Freeman indicated Mr.

Gladden could attend, as Mr. Freeman claimed only to be Mr. Gladden's "messenger." *Id*.

### III.    LAW AND ARGUMENT

**A.  PEPCO is liable to Plaintiffs if Plaintiffs prove that PEPCO had prior notice of the hazardous condition of the Grate and/or the hazardous condition of the Grate was created by PEPCO and Plaintiffs request this Court make an adverse inference under FRCP 37(e)(2)(A) that the lost information was unfavorable to PEPCO.**

Generally, there are two things that must be established to prove liability in a negligence

action predicated on the existence of a dangerous condition, which is that (i) the defendant had

notice of the dangerous condition, and (ii) the condition was hazardous or defective. *District of*

*Columbia v. Freeman*, 477 A.2d 713, 718 (D.C. 1984). The defendant may either have actual

notice of the hazardous condition or constructive notice of the hazardous condition. *Sullivan v.*

*AboveNet Communs., Inc.*, 112 A.3d 347, 356 (D.C. 2015) (*quoting Anderson v. Woodward &*

*Lothrop*, 244 A.2d 918, 918-19 (D.C. 1968)). A party has constructive notice when "…'the

condition had existed for such length of time that, in the exercise of reasonable care, its existence

should have become known and corrected.'" *Id*. However, notice does not need to be shown when

an agent of the defendant created the hazardous condition through his/her own negligence. *Johnson*

*v. Washington Gas Light Co.*, 109 A.3d 1118, 1121 (D.C. 2015); *See also Sherman v. District of*

*Columbia*, 653 A.2d 866, 870 (D.C. 1995).

In this matter, there appears to be no dispute of fact as to whether the condition of the Grate

was hazardous or defective, Mr. Deen, the designated representative of PEPCO, clearly testified

that the condition of the Grate was hazardous:

> Q.   And what am I looking at here?  What is the problem?
> A.   It's not -- it's not level.
> Q.   That there's a lip sticking up that causes a trip hazard?
> A.   Yes.

Q.   And you would agree that that's below the standard to which Pepco needs to maintain its grate for public safety; is that correct?
A.   Yes.

(Deen Dep. 112:19-113:2.) Additionally, Mr. Freeman articulated to this Court that the issue of liability in this case seems to hinge on the issue of notice:

> THE COURT: Let me just ask this question based upon what's being said. Is there a dispute as to liability?
> MR. FREEMAN: Yes. The question is whether or not at the time that Mr. Shenton tripped Pepco either had actual notice or constructive notice. So the issue is going to be whether Pepco's protocols, and I want to address that because counsel for the plaintiff has, whether the protocols satisfy the standard of care that is reasonable, to deterrent, to look at 10,000 or more grates that are in the District to periodically look at them to see if they are in need of repair

(Conference Tr. 10:12-22.) However, Mr. Freeman's statements fail to address the fact that notice need not be proven when the hazardous condition is created through the negligence of an employee/agent of PEPCO. *Johnson v. Washington Gas Light Co.* at 1121 (D.C. 2015). Nevertheless, it is clear that the parties agree the Grate's condition at the time of Mr. Shenton's accident was hazardous. The question then, for Mr. Shenton to prove liability, is to show Pepco had notice of the Grate's condition prior to Mr. Shenton's fall or PEPCO's employee/agent created the hazardous condition of the Grate.

In fact, Mr. Gladden, when finally deposed, offered just this testimony.  In his 39 years of experience at PEPCO, Mr. Gladden testified that (i) only PEPCO employees can enter the grates with their keys, (ii) that over the time he worked at PEPCO he had repaired hundreds or thousands of these grates, (iii) that he would see grates like this - where the grate was uneven and that -- where the lock had been accessed and hadn't been put back in about a dozen times a year, and (iv) in his opinion the grate in question prior to repair "just looks like it hasn't been closed properly."

29

That deposition testimony is below:

Q. Mr. Gladden, we went over this a little bit, but can you identify for me all the individuals, whether they're an employee or contractor, by what department who would have access to the lock or the latch on these grates to raise them?
MR. FREEMAN:  Object to form and foundation.
A. Anybody, I guess, at PEPCO that was allowed to enter transformer vaults had keys.
Q. No one outside of PEPCO would have a key?
A. Not that I know of.
Q. And why is it that they -- they enter those transformer grates --
MR. FREEMAN:  Objection.  Form and foundation.
Q.-- in your experience?
A. To do maintenance on transformers.
Q. And once you insert the key to open it, how heavy are the grate doors to open?
A. Say that again, now.
Q. Once you insert this master key, or this castle key into the grate to open it, how heavy are the doors to open?
A.Not very heavy at all.
Q.Do you use a special tool to raise it, or you just --
A. No.  Just square your hands and raise it.
Q. But it can't be opened without the key to begin with?
A. Correct. I guess if you took a screwdriver, you might; but no, a key.
…
Q. Mr. Gladden, so you were at PEPCO for 39 years. If you were to try to approximate how
many of these grates that you repaired during your time at PEPCO?
MR. FREEMAN:  Object to the form. (Inaudible.)
Q. What's that?
A. Hundreds, thousands.  I'm not sure.
Q. Well, if you were there 39 years, you know, and you were to approximate how many you did, say, per year, what would that be?
A. Per year?
MR. FREEMAN:  Object to the form.
A. Twenty.
Q. Okay. And did you see grates like this where there was a grate that was uneven and that maybe had -- where the lock had been accessed and hadn't been put back in?
A.Yes.
Q.If you had to guess how many times you saw that, what would that be, say, per year?
MR. FREEMAN:  Object to the form, when you're asking him to guess.
Q. I'm asking you to approximate, in your time that you were there.
MS. GUGINO:  Same objection.
A. (Inaudible.)
MR. FREEMAN:  What was the answer?
THE REPORTER:  What was the answer?
Q. What was that?
A. Maybe a dozen.

Q. Okay. So maybe dozen a year.

…

BY MR. FREEMAN:

Q. All right.  So you had testified on questions of Ms. Gugino that this showed that the point there that's raised up a little was not completely flush right at that corner.  And you indicated that the only way that people could get into the grate was -- I mean, the only way they could not close it was to open it to go into the grate. But later, you also testified about your experience with trucks having come onto the sidewalk. Can you tell from this particular photograph whether we're looking at the slightly raised grate at that point because somebody didn't close it or whether we're looking at the slightly raised grate because of this --

MS. GUGINO:  Objection.  Calls for speculation.

BY MR. FREEMAN:

Q.   You can answer.

A.   Just looks like it hasn't been closed properly.

(Gladden Dep. 46:16-48:3; 48:16-50:2; and 51:15-52:12)

Clearly, Mr. Gladden's testimony is critical to liability in this case. Unfortunately, the Defendants' have so egregiously abused the discovery process and destroyed evidence, including evidence related to this particular grate, notes maintained by the General Shops department and documents identifying instances this grate was accessed by PEPCO employees leading up to the incident, that Plaintiffs' ability to prove negligence in this matter beyond Mr. Gladden's testimony is severely prejudiced. (Gladden Dep. 33:6-17; 34:4-14; and 35:2-13.) As a result, this Court should sanction Defendants by rendering a default judgment on the issue of liability in Plaintiffs' favor, or at the very least, provide an adverse evidence inference that PEPCO has destroyed evidence which would tend to prove that PEPCO had prior notice of the hazardous condition of the Grate, or that the hazardous condition of the Grate was created by an employee/agent of PEPCO.

Here, it is evident, after the great efforts expended by Plaintiffs simply to require Defendant identify the individuals' names who repaired the grate and *then* provide contact information  that the testimony of Mr. Gladden is indispensable in his opinion that the grate was not closed properly

31

by a PEPCO employee with a key. (Gladden Dep. 46:16-48:3; 48:16-50:2; and 51:15-52:12) In

light of the fact that all other documents have been destroyed and/or are otherwise "unavailable"

for production by Defendant, Plaintiffs request this Court make an adverse inference pursuant to

the provisions of Civil Rule 37 that "presumes that the lost information was unfavorable to the

party" PEPCO.

> Because issue-related sanctions are fundamentally remedial rather than punitive
> and do not preclude a trial on the merits, we conclude that they do not require a
> heightened standard of proof. Rather, a district court may impose issue-related
> sanctions whenever a preponderance of the evidence establishes that a party's
> misconduct has tainted the evidentiary resolution of the issue.

*Shepherd v. ABC*, 314 U.S.App.D.C. 137, 62 F.3d 1469, 1478 (1995). For the foregoing reasons,

Plaintiffs request this Court impose an issue-related sanction upon PEPCO finding that *according*

*to the only evidence available to the parties,* that the grate in question was under the exclusive

control of PEPCO, that only PEPCO employees had keys and access to the same and that as a

result of a PEPCO employee's actions the grate had not "been closed properly" as testified by Mr.

Gladden.

## B.  This Court Should Issue Sanctions under its Inherent Authority and 28 USC §1927.

Courts use section 1927 to sanction attorneys who abuse the judicial process with "repeated

or singularly egregious" misbehavior. *United States v. Wallace,* 964 F.2d 1214, 1220, 296 U.S.

App. D.C. 93 (D.C. Cir. 1992). Under 28 U.S.C.S. § 1927, any attorney admitted to conduct cases

in any court of the United States who so multiplies the proceedings in any case unreasonably and

vexatiously may be required by the court to satisfy personally the excess costs, expenses, and

attorneys' fees reasonably incurred because of such conduct. *In re Erin & Kyle Ltd. Pshp.,* Case

No. 96-01318, (Chapter 11), 1997 Bankr. LEXIS 188, at *1 (Bankr. D.D.C. Feb. 27, 1997)

A showing by the moving party that the counsel in question acted recklessly or deliberately "in the face of a known risk" is required. *Healey v. Labgold,* 231 F. Supp. 2d 64, 68 (D.D.C. 2002). Neither 28 U.S.C.S. § 1927 nor Fed. R. Civ. P. 11 limits a court's inherent authority to sanction bad-faith conduct when the party's conduct is not within the reach of the rule or the statute. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 35, 111 S. Ct. 2123, 2128 (1991).

> …a court may assess attorney's fees when a party has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons. '" *Alyeska, supra*, at 258-259 (quoting *F. D. Rich Co.* v. *United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129, 40 L. Ed. 2d 703, 94 S. Ct. 2157 (1974)). See also *Hall* v. *Cole*, 412 U.S. 1, 5, 36 L. Ed. 2d 702, 93 S. Ct. 1943 (1973); *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, n. 4, 19 L. Ed. 2d 1263, 88 S. Ct. 964 (1968) *(per curiam)*. In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, *Universal Oil, supra*, at 580, as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order," **10** *Hutto*, 437 U.S. at 689, n. 14. The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy." *Ibid.*

*Id.*

As outlined extensively herein, there is no question that PEPCO and its counsel multiplied the proceedings unreasonably and vexatiously and further acted recklessly and in bad faith, making direct misrepresentations to the Court that were later quickly proven to be completely untrue.  Such actions have further delayed and disrupted this litigation and hampered Plaintiffs' efforts to pursue the same.  As a result, Plaintiffs request this Court impose sanctions for the conduct outlined herein under its inherent powers and pursuant to 28 U.S.C.S. § 1927 for the costs, expenses and attorneys fees incurred. *Plaintiffs' have been severely prejudiced by the Defendant's abuse of the discovery process.*

**C. This Court Should Sanction Defendant with a Default Judgment in Favor of Plaintiffs on the Issue of Liability.**

The three justifications that support a default judgment sanction are: (i) the adversely affected party has been so prejudiced by the misconduct it would be unfair to require him to proceed further in the case, (ii) the misconduct of the errant party has caused prejudice to the judicial system, or (iii) the sanction is necessary to deter similar misconduct in the future. *Webb v. District of Columbia,* 146 F.3d 964, 971 (D.C. Cir. 1998) (*citing Shea v. Donohoe Construction Company*, 795 F.2d 1071 (D.C. Cir. 1986)). In this case, all three circumstances have been met to support granting a default judgment in Plaintiffs' favor.

*i.      Plaintiffs have been severely prejudiced by the Defendants' misconduct.*

Several types of discovery abuse may cause a plaintiff such severe prejudice to warrant a default judgment in the plaintiff's favor. First, a court may enter a default judgment when a plaintiff has experienced a significant delay in discovery. *See United States v. Di Mucci*, 879 F.2d 1488 (7th Cir. 1989) (entering default judgment when defendants' refused to comply with discovery orders causing a ten month delay). Second, when the abuse involves the destruction of documents, default judgment may be granted:

> [W]here the destroyed document is dispositive of the case, so that an issue-related sanction effectively disposes of the merits anyway, *see, e.g., Synanon Church,* 820 F.2d at 427-28; *State Farm Fire & Casualty Co. v. Frigidaire,* 146 F.R.D. 160, 163 (N.D. Ill. 1992); and where the guilty party has engaged in such wholesale destruction of primary evidence regarding a number of issues that the district court cannot fashion an effective issue-related sanction, *see, e.g., Telectron, Inc. v. Overhead Door Corp.,* 116 F.R.D. 107, 135 (S.D. Fla. 1987); *Wm. T. Thompson Co. v. General Nutrition Corp.,* 593 F. Supp. 1443, 1456 (C.D. Cal. 1984). *See generally* Gorelick, DESTRUCTION OF EVIDENCE § 3.16, at 122-26 (collecting cases).

*Shepherd v. ABC* at 1479. Third, courts have granted a default judgment when, among other things, a party has "…made numerous representations to the Court that are diametrically at odds with the

documentary evidence present in the record" and "…produced voluminous amount of irrelevant and misleading materials. *Slate v. ABC, Inc.*, 941 F.Supp.2d 27, 49-50 (D.D.C. 2013).

In this case, Plaintiffs have been significantly prejudiced by the Defendants' misconduct. First, discovery requests have been pending in this matter for nearly a year and a half. (*See* **Exhibit A**.) In this time, Defendants have failed to respond to numerous interrogatories and requests for production contained in the First Set of Discovery in compliance with the rules of discovery. (*See* Motion to Compel, ECF No. 54) As for the Second Set of Discovery, Defendants refused to respond to Interrogatories numbered 6, 7, 8, 9, 10, 11, and 16, by making general statements that "Pepco is presently researching to determine whether there is anyone with the company who can respond to this Interrogatory and will supplement this response as soon as possible." (Gugino Decl. Ex. 14.) These interrogatory responses were never supplemented, despite the follow up request of Plaintiffs' counsel. (Gugino Decl. Ex. 15.) No additional documents were produced in connection with the Second Set of Discovery, despite the fact that PEPCO in its response, and Mr. Freeman by email, indicated that it would produce a "Records Retention Schedule." (Gugino Decl. Ex. 16.)

Additionally, despite Plaintiffs' request that PEPCO identify the individuals who repaired the Grate on May 17, 2021, the Defendants failed to identify these individuals until June 7, 2022, over a year later. (Gugino Decl. Ex. 1; Finney Decl. Ex. 20.) The continued delay by PEPCO, and PEPCO's repeated failure to respond to discovery has significantly prejudiced Plaintiffs' ability to prepare for trial.

Furthermore, through the deposition testimony of numerous PEPCO employees, it is clear that PEPCO has spoliated evidence, as any electronic records maintained by PEPCO, including emails, have been destroyed or made inaccessible by PEPCO. (Deen Dep. 62:20-63:6, 64:7-12, 68:25-70:9, 102:12-17, 103:6-16, 105:20-106:6)   These files were destroyed *after* PEPCO had

notice of Mr. Shenton's claim. (Money Dep. 48:17-49:5) Some of the documents that were destroyed or made inaccessible may have included prior claims related to the Grate at issue in this case, job orders for the Grate, emails and electronic documents relating to the repair of the Grate, and notes on internal communications related to the resolution of Mr. Shenton's claim prepared in the ordinary course of business.  To this day, PEPCO persists in its refusal to tell Plaintiffs when these documents were destroyed. (Gugino Decl. ¶21, Ex. 14 at 5-6, and Ex. 15.)

Next, Mr. Freeman has made a blatant misrepresentation to this Court when attempting to justify PEPCO's refusal to identify the individuals who repaired the Grate. Specifically, Mr. Freeman told this Court that he specifically questioned Mr. Gladden to find out if Mr. Gladden repaired the Grate, and claims Mr. Gladden did not repair the grate *or have any memory of the Grate or repair*:

> MR. FREEMAN: Your Honor, this is Martin Freeman. What we said was with respect to who repaired it see this document. We did not say and do not say today that Mr. Gladden is the person who conducted the repairs. **He doesn't have any memory of that**, and so no other documents. There's nobody else who has memory of it. And I'm sorry that that is so, but we do know that it was repaired. We do know it needed repair and we have stipulated to those two facts.

> THE COURT: **Are you saying that you specifically queried <u>Gladden</u>** to find out whether he had performed the repair and he said he didn't recall or didn't do it?

> MR. FREEMAN: **We not only questioned him**, Pepco canvassed many different people to try to identify the particular person who either repaired it or was supervisor at the time when it was repaired on site and we came up empty. I'm sorry, we did.

(Conference Tr. 14:14-15:5, emphasis added.) However, this proved to be a blatant misrepresentation to the Court, as *Mr. Gladden had not spoken with anyone at PEPCO or Mr. Freeman, until July or August 2022*, and Mr. Gladden was never asked by anyone, prior to his deposition, anything about the Grate or the incident in question. (Gladden Dep. 12:22-14:7.) Additionally, Mr. Deen testified on behalf of PEPCO that Mr. Gladden and Mr. Green repaired

the Grate. (Deen Dep. 97:5-22.) Information related to prior conditions of the Grate, and the repairs that were made to the Grate, are of paramount importance in this matter. Mr. Gladden testified that based on his experience at PEPCO, and inspection of the photographs of the Grate, it appeared that the Grate was not flush with the ground because a PEPCO employee failed to properly lock the Grate. (Gladden Dep. 46:16-48:3; 48:16-50:2; and 51:15-52:12) Additionally, the failure to properly lock transformer gratings was a common problem Mr. Gladden encountered in his experience "repairing" grates. *Id*.

Additionally, the bulk of documents produced in this matter are entirely irrelevant and caused Plaintiffs' counsel to spend hours reviewing over 1,500 pages of "policies and procedures" for inspecting *manholes*, which are completely different and unrelated to the Grate at issue in this case. (Burgher Dep. 50:7-51:22.) Mr. Burgher confirmed that the Grate would not have been part of the manhole inspection program. (Burgher Dep. 50:7-51:22.) However, PEPCO has produced a document claiming to be an inspection report of the Grate dated September 24, 2012, despite the fact that the Grate was not part of the inspection program, and despite the fact that the electronic files of PEPCO existing before 2017 or 2018 were destroyed and/or made inaccessible. (Deen Dep. 101:23-102:10 and Ex. R.) Yet somehow, this September 24, 2012 document is available to PEPCO and produced in discovery. *Id*.

Further, PEPCO has baselessly refused to produce discoverable documents, and instead submitted them for *in camera* review, claiming attorney-client privilege. As extensively briefed in Plaintiffs' Motion to Compel, a "multiple purpose" communication is subject to the attorney-client privilege only if that communication would not have been made "but for" the client's need to seek legal advice or legal services and a "multiple purpose" investigative document does not qualify for work product protection if the investigation would have been undertaken even

"absent the possibility of litigation." *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 127-128 (D.D.C. 2012). Ms. Money, the former PEPCO employee who investigated Mr. Shenton's claim pre-litigation, clearly testified that she does not speak with any attorneys at PEPCO until *after* a lawsuit is filed, and that her direct supervisor she reports to is *not* an attorney. (Money Dep. 86:11-87:13.) Thus, the documents submitted for *in camera* review are not privileged materials, as they were all created prior to this action being filed and Ms. Money would not have spoken with an attorney until after this action was filed, if ever.

Finally, Defendants further caused prejudice to the Plaintiffs' by marking 1,653 of the 1,671 pages of document production as "CONFIDENTIAL" when the majority of these documents do not meet the requirements of the Protective Order. Specifically, the Reports, which are publicly available records, were marked as confidential and images of the public sidewalk were also marked as confidential. (Gugino Decl. ¶32 and Ex. 12.)

The Defendant's repeated stonewalling and abusive practices have severely prejudiced Plaintiffs' ability to vindicate their rights in this litigation – something that should have been a routine and simple case. Specifically, absolutely no documents have been produced related to the policies and procedures of inspecting transformer grates, as the type of grate at issue here as identified by Mr. Burgher (Burgher Dep. 50:7-51:22.) Instead, over a thousand pages of policies and procedures of inspecting manholes has been produced, which is irrelevant to transformer grates. *Id*. All records of complaints and/or repairs of the Grate at issue in this case have been destroyed or made unavailable by PEPCO in or about 2017 or 2018, after PEPCO had notice of Mr. Shenton's August 13, 2016 accident. (Deen Dep. 68:25-69:2; Money Dep. 48:17-49:5.) Plaintiffs cannot even ascertain precisely when these documents would have been destroyed and/or

made unavailable, as Defendants have refused to respond to the Second Set of Discovery. (Gugino Decl. ¶19-20 and Ex. 13, 14.)

ii.    *This Court has been prejudiced and burdened by the Defendant's abuse of the discovery process.*

When considering whether or not to grant a default judgment, a court may consider "…when the party's misconduct has put 'an intolerable burden on a district court by requiring the court to modify its own docket and operations in order to accommodate the delay.'" *Webb v. District of Columbia* at 971 (*quoting Shea v. Donohoe Construction Company* at 1075).

This Court has been prejudiced and burdened by the Defendants' conduct and continually been forced to modify its docket and operations to accommodate the Defendant's delay. Specifically, the Defendant's conduct has forced this Court to hold two discovery related conferences, with a third scheduled to occur on November 17, 2022. Additionally, the Defendants' conduct has necessitated the need for the Plaintiffs to file a Motion to Compel along with this Motion for Discovery Sanctions.  Finally, the discovery deadline in this matter has been reset multiple times as a result.

iii.    *The Defendant's conduct is so egregious that the Court must sanction them with a default judgment to deter similar misconduct in the future.*

A court may award a default judgment in order to sanction conduct disrespectful to the court and deter future misconduct. *Webb v. District of Columbia* at 971. If the sanction is based only on deterring misconduct, the defendant's misconduct must be flagrant or egregious. *Id* at 975 (*citing Bonds v. District of Columbia,* 93 F.3d 801, 809 (D.C. Cir. 1996)). Additionally, a default judgment has been justified when a defendant repeatedly and inexcusably obstructed every type of discovery attempted by the plaintiffs. *Wanderer v. Johnston*, 910 F.2d 652 (9th Cir. 1990).

Here, Mr. Freeman's blatant misrepresentation to this Court amounts to such flagrant disrespect for the Court, that alone should be sufficient grounds to award default judgment in Plaintiffs' favor. How can a party engage in discovery when the opposing party will so blatantly conceal from the court certain facts? Here, those facts are the identify of who repaired the Grate and further the destruction of responsive documents *after* notice of Plaintiffs' claim. As it turns out, the withholding of information about the contact information of who repaired the grate turned out to be critically important, as that person with 39 years of experience at PEPCO testified that (i) only PEPCO employees can enter the grates with their keys, (ii) that over the years he worked at PEPCO he had repaired hundreds or thousands of these grates, (iii) that he would see grates like this - where the grate was uneven and that -- where the lock had been accessed and hadn't been put back in about a dozen times a year, and (iv) in his opinion the grate in question prior to repair "just looks like it hasn't been closed properly." (Gladden Dep. 51:15-52:12.) The type of conduct as has been outlined herein and has played out in this action – discovery stonewalling and abuse along with blatant misrepresentations to the Court - is without a doubt conduct that must be deterred.

Additionally, the Defendant has provided discovery responses which are *unrelated entirely* to the grate at issue in this action (Burgher Dep. 50:7-51:22) and continually refused to provide complete responses to interrogatories and requests for production, forcing Plaintiffs to write deficiency letters, follow-up on pending discovery issues numerous times, file a Motion to Compel, and file this Motion for Sanctions. This type of flagrant disregard for the discovery process must be deterred. Finally, Mr. Freeman continually obstructed efforts to conduct depositions, canceling Plaintiffs' expert deposition at the last minute *twice* and failing to provide Plaintiffs with accurate contact information for Mr. Gladden, making service of a subpoena on him unnecessarily difficult.

Alternatively, if this Court does not find that a default judgment is warranted by clear and convincing evidence, the Court may instead find that a preponderance of the evidence support the imposition of a lesser, issue-related sanction that is at the heart of the discovery in this matter: an adverse inference that either PEPCO knew the Grate was defective prior to Mr. Shenton's trip, or the hazardous condition of the Grate was created by a PEPCO employee's failure to secure the Grate. *Shepherd v. ABC*, 314 U.S.App.D.C. 137, 62 F.3d 1469, 1478 (1995).

### D. This court should sanction Defendant with the payment of Plaintiffs' attorneys fees for bringing this Motion and Plaintiffs' Motion to Compel.

This Court has the power pursuant to Fed R. Civ. P. 37(d)(3), 28 USC §1927, and its inherent power, *Priority One Servs. v. W&T Travel Servs., LLC,* 987 F. Supp. 2d 1, 2 (D.D.C. 2013), to require the wrongdoing party to pay the attorney's fees and costs incurred by the other party. This Court itself has indicated to Plaintiffs that if Plaintiffs can prove, specifically, that Defendants' failed to identify the individuals who repaired the Grate, it would award Plaintiffs their attorneys fees:

> THE COURT: …I can't stop you from taking the deposition of whoever you think could lead you to find out who it was who made the repair. And I would tend to agree with you that if in fact you go down that road **and you're able to determine or discover who in fact did the repair contrary to what you're being told by defense counsel then I think that would be fair that you should be compensated for that**. I don't have a problem with that. Because I agree that if it's able to be determined through the defense and they can advise you of that and therefore avoid you having to go down that road that should occur, but he's saying he's done that. Based upon what he's done he can't determine who it was. But if you want to conduct the discovery you say you want to do conduct and you're able to determine what you believe you can determine if that becomes reality then I would tend to agree. I would make them pay for the cost of you having to do what you shouldn't have had to do.

(Conference Tr. 18:21-19:12, emphasis added.) The Court further reiterated this point by stating to Plaintiffs' counsel "[a]nd as I say if you're right and that discovery does disclose who did the

repair then I would make them pay for you having to do what you did." (Conference Tr. 19:23-25.)

As extensively briefed herein, discovery has revealed not only that Mr. Gladden and Mr. Green repaired the Grate, but as testified by Mr. Gladden, the condition of the Grate appears to have been created by a PEPCO employee's failure to properly secure the Grate. Discovery further revealed that Mr. Freeman and PEPCO did NOT question Mr. Gladden on this matter, contrary to Mr. Freeman's representation to this Court. The Defendants have vexatiously driven up the cost of this litigation by fighting every attempt at discovery conducted by Plaintiffs including failing to respond to discovery requests, producing voluminous irrelevant documents, and spoliating evidence after notice of the claims herein, such that payment of Plaintiffs' attorneys' fees by Defendants is warranted.

## IV.   CONCLUSION

For the foregoing reasons set forth herein, the Plaintiffs respectfully request that this Court issue discovery sanctions against the Defendants in the form of:

(i)     A default judgment in Plaintiffs' favor on issue of Defendants' liability; or

(ii)    An adverse inference that Defendants either (a) knew the Grate was defective prior to Mr. Shenton's trip, or (b) the hazardous condition of the Grate was created by a PEPCO employee's failure to secure the Grate; and

(iii)   An award of attorneys' fees and costs to Plaintiffs for the fees and costs incurred by Plaintiffs related to discovery, Plaintiffs' Motion to Compel, and this Motion for Sanctions. The amount of attorneys fees to be determined by a separate motion to the Court upon the resolution of this Motion for Sanctions.

Respectfully submitted,

*/s/ Christopher P. Finney*
Christopher P. Finney (OH0043)
Curt C. Hartman, *of counsel* (OH0040)
Julie M. Gugino, *pro se* (0074471)
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Blvd., Suite 225
Cincinnati, OH 45245
Chris@FinneyLawFirm.com
Julie@FinneyLawFirm.com
*Trial attorneys for Plaintiffs*
*Glenn Shenton and Pamela Shenton*